FERDINAND STINES, complainant,

*v.*

JAMES D. CARTON, executor, &c., defendant.

[Decided May 18th, 1925.]

On appeal of William B. White. On appeal from a decree of the court of chancery advised by Vice-Chancellor Foster, who filed the following opinion:

"This is an interpleader suit, and the controversy arises over a fund of $8,000, which the decedent, Charles O'Malley, entrusted to the care of complainant.

"The money had been paid into court, less the amount of Mr. O'Malley's funeral expenses, which was paid by complainant therefrom, with the consent of both defendants.

"The facts established at the hearing are that Mr. O'Malley, who conducted a hotel near Belmar, in Monmouth county, some time in 1920 or 1921, gave complainant $1,000 in cash, to keep for him, and some time in 1922 decedent gave to complainant the further sum of $7,000 in cash, to keep for him.

"In the spring and summer of 1922, O'Malley was drinking very heavily, and, according to complainant, was almost continuously under the influence of intoxicating liquors, and was quite ill at times, and after June 15th he was seriously ill.

"On June 30th, 1922, he was intoxicated, and had received a draft of his will, and before executing it he told complainant and the defendant White that the priest and others could not wait until he was dead to get his money. He executed the will that night, however, Mr. White and his wife acting as the witnesses, at the request of O'Malley and Father Mc-Connell. This will was duly admitted to probate, and by

its terms, after the payment of his debts and funeral expenses, decedent gave to Rev. William J. McConnell, rector of the Church of St. Rose, Belmar, New Jersey, $3,000, for certain specified purposes; to Father McConnell personally he gave $5,000, and the residue of the estate was given to the Church of St. Rose for the use of the parish school. Mr. Carton was appointed the executor, and has duly qualified.

"On July 1st, the day following the making of the will, O'Malley, while still intoxicated, had the defendant White, in the presence of Stines, write on a blank bank check the following: 'July 1st, 1922. I will turn over to W. B. White, $8,000.00/100 eight thousand after Charles B. O'Malley's death dollars,' and O'Malley had complainant sign this, and it was then delivered to White.

"After the execution of this paper, complainant, as he states, for his own protection, had prepared and had O'Malley sign a paper reading as follows:

> " 'Belmar, N. J., July 1, 1922.
> " 'I Charles O'Malley, do hereby request Ferdinand Stines to pay to W. B. White upon the event of my death, the sum of eight thousand dollars [$8,000] belonging to me and now in the possession of Stines.
> " 'In the presence of          [Signed]    CHARLES O'MALLEY.' "

"After the execution of these papers on July 1st, O'Malley returned with White to the latter's home in South River, where he had spent the previous night after executing his will, and on July 3d, while White and O'Malley were driving from South River to Belmar, they met Leo J. Coakley, a lawyer of this state, to whom White introduced O'Malley, and the latter told Coakley of the paper Stines had signed on July 1st, and he requested Coakley to prepare a paper for O'Malley to sign, and which was to be held by White; this paper was then prepared by Coakley, and later on that day it was signed by O'Malley in the presence of two witnesses. This paper reads as follows:

" 'July 3d, 1922.
" 'Whereas I am indebted to William B. White of South River for many favors done me and I having coming to me from the Belmar Building and Loan the sum of eight thousand dollars, now therefore for the consideration of the sum of one dollar and other good and valuable considerations I hereby assign and transfer unto William B. White the said sum of eight thousand dollars, transfer to take place upon my death.

" 'The said sum is now in the name of Fred Stines.

" 'CHARLES O'MALLEY.

" 'Witnessed by
" 'EDWARD COST,
" 'FELIX ARNOULD.' "

"After this paper was executed, O'Malley gave it to White. O'Malley was so ill at this time that he was taken to the hospital almost immediately after signing this paper, and he remained in the hospital until July 10th, when he returned to his hotel at Belmar.

"After he returned to Belmar, O'Malley had many conversations with complainant about his money. He could not recall anything about the two papers that had been executed on July 1st, and he did not tell Stines of the paper he had signed on July 3d. He frequently demanded his money from Stines, and Stines refused to give it to him until he returned to Stines the paper Stines had signed on July 1st, and which O'Malley had given to White. O'Malley repeatedly told Stines he would get this paper back from White, but he never did so. Stines had loaned the $8,000 to the Belmar Building and Loan Association, and he gave O'Malley the interest he received from this loan.

"O'Malley, during the summer of 1922, frequently complained of the lack of money and of the small amount he had on deposit to his credit in bank, and he could not recall having withdrawn and used but a few hundred dollars for expenses while at the hospital. Stines, on investigating the matter, found and told O'Malley that his bank account was overdrawn, and, on an examination of the canceled checks by O'Malley and Stines, it was found that the overdraft and the shortage in O'Malley bank account was due to two

27

checks O'Malley had drawn and apparently forgotten, one to White for $1,000 and one to Mrs. White for $2,000.

"From a letter written by Mrs. White to O'Malley, in October, 1922, and from the testimony of Stines, it would appear that White and O'Malley were both engaged in the illegal sale of liquor, and that White, at least, was engaged in the business as a 'bootlegger.' It was also shown that O'Malley and White had been acquaintances or friends for over twenty years, and that they frequently visited each others' home.

"Mr. O'Malley died on November 2d, 1922, without relatives, so far as known.

"Upon his death, demand was made upon complainant by his executor and also by Mr. White for the fund in question, and which practically constitutes his entire estate, and these conflicting demands resulted in this action.

"At some of the hearings there was some uncertainty as to the exact nature of the claim made by White to this fund, and counsel for Mr. White finally announced that O'Malley, by the papers mentioned, had created an irrevocable trust of this fund for the benefit of White, and I now find on his brief that counsel for Mr. White states his claim in the following manner:

" 'From the above facts the defendant White contends—

" '(1) That none of the papers executed constituted a will or attempt at testamentary disposition.

" '(2) That the transaction did not constitute a gift *inter vivos* or a gift *causa mortis.*

" '(3) White does contend, however, that on July 1st, 1922, O'Malley imposed a trust upon the said fund of $8,000 for the benefit of White; that this was a perfectly created and completed trust by parol, and evidenced by these paper writings.'

"From the record, and especially from the three papers on which White relies, I am unable to find any evidence of the trust which White claims. The first paper which O'Malley had Stines sign is, by its express terms, nothing more

than an acknowledgment by Stines that he had $8,000 of O'Malley's money which he promised 'to turn over to White after O'Malley's death.' The second paper which Stines had O'Malley sign for his protection, and not for White's benefit, requests Stines to pay White $8,000, 'upon the event of my [O'Malley's] death,' and the third paper drawn by the lawyer, Mr. Coakley, is, by its expressed terms, an assignment from O'Malley to White for a valuable consideration of the money in question, then loaned in the name of Stines to the Belmar Building and Loan Association, the transfer of the fund to take place upon O'Malley's death.

"From my consideration of the entire record I have reached the conclusion that O'Malley did not create a trust in the fund in question for the benefit of White. What he did, and what I think the proofs clearly show he attempted ineffectively to do, while under the influence of liquor, and without competent advice, and probably unduly influenced against those who persuaded him to make his will, was to attempt, by these papers, to make a testamentary disposition of this fund without the formalities attendant upon the execution of a will.

"He was apparently angry at those who urged him to make a will, and he was neither physically nor mentally sober or strong enough to resist these importunities, but as a result of them he harbored a resentment which he attempted to gratify by the papers in question.

"On his return from the hospital his feelings underwent another change; he turned against White and his wife; he told Stines he owed them nothing, claimed they had been well paid for all they had done for him, and threatened and promised to make White return to him the papers on which White now rests his claim.

"While it is of course true that no special language need be employed to create a trust such as White now claims, it is equally true that an intention to establish such a trust, and an effort to give effect to such intention, must be shown by a clear preponderance of the proof in order to establish

such a trust. As no such proof is present here, a decree will be advised that the fund be paid to the executor of O'Malley's estate."

*Mr. George L. Burton,* for the appellant.

*Messrs. Durand, Ivins & Carton,* for the respondent.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Vice-Chancellor Foster.

*For affirmance*—THE CHIEF-JUSTICE, TRENCHARD, MINTURN, KALISCH, BLACK, KATZENBACH, LLOYD, WHITE, GARDNER, VAN BUSKIRK, CLARK, McGLENNON, KAYS, JJ. 13.

*For reversal*—PARKER, CAMPBELL, JJ. 2.